AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
## for the
### District of Columbia

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| INFORMATION ASSOCIATED WITH AN ACCOUNT STORED AT PREMISES CONTROLLED BY TWITTER, INC. PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF VIOLATIONS OF 18 U.S.C. § 2101, 18 U.S.C. § 371, 18 U.S.C. § 371, 18 U.S.C. §§ 231(a)(3), and 2101, and 40 U.S.C. § 5104 | )  )  )  )  ) |

Case No. 21-SC-703

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A

Located in the _____ Northern District of California _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2101 (interstate travel to riot), ; 18 U.S.C. § 371 (Klien conspiracy to obstruct a lawful function of government); 18 U.S.C. § 371 (conspiracy to violate federal law including, 18 U.S.C. §§ 231(a)(3) (civil disorder), and 2101 (interstate travel to riot), and 40 U.S.C. § 5104 (unlawful activities on capital grounds). | |

The application is based on these facts:

See Affidavit in Support of Application for Search Warrant.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

David Williams, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
Telephone _____ *(specify reliable electronic means).*

Date: _____ 3/2/2021 _____

_____
*Judge's signature*

City and state: _____ Washington, D.C. _____

_____
Zia M. Faruqui
United States Magistrate Judge

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means        ☑ Original        ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | )    Case No.  21-SC-703 |
| INFORMATION ASSOCIATED WITH  AN ACCOUNT STORED AT | ) |
| PREMISES  CONTROLLED BY TWITTER, INC. PURSUANT TO 18 | ) |
| U.S.C. 2703 FOR INVESTIGATION OF VIOLATIONS OF 18 U.S.C. § | ) |
| 2101, 18 U.S.C. § 371, 18 U.S.C. § 371, 18 U.S.C. §§ 231(a)(3), and 2101, | ) |
| and 40 U.S.C. § 5104 | |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

      An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ Northern District of California _____ .
*(identify the person or describe the property to be searched and give its location)*:

See Attachment  A (incorporated by reference).

      I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment  B (incorporated by reference).

      **YOU ARE COMMANDED** to execute this warrant on or before _____ March 11, 2021 _____ *(not to exceed 14 days)*
  ☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

      Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

      The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Robin M. Meriweather _____ .
                                                          *(United States Magistrate Judge)*

  ☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
    ☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:  _____ 3/2/2021 _____        _____

City and state:  _____ Washington, D.C. _____        _____
                                                                            Zia M. Faruqui
                                                         United States Magistrate Judge

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br><br>21-SC-703 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## <u>ATTACHMENT A</u>

**Property to Be Searched**

This warrant applies to information associated with the Twitter account with username @BrndnBckstrm, bearing account number 830164304385101824, and which is stored at premises owned, maintained, controlled, or operated by Twitter, Inc., an electronic communications provider that accepts service of legal process at  1355 Market Street, Suite 900, San Francisco, California 94103 (the "SUBJECT ACCOUNT").

**ATTACHMENT B**

**Particular Things to be Seized and Procedures
to Facilitate Execution of the Warrant**

I.     **Information to be disclosed by Twitter, Inc. ("PROVIDER") to facilitate
       execution of the warrant**

For the time period November 3, 2020 to the present: To the extent that the information

described in Attachment A is within the possession, custody, or control of Twitter, including any

messages, records, files, logs, or information that has been deleted but are still available to Twitter,

or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Twitter is required

to disclose the following information to the government for each account listed in Attachment A:

a.     All identity and contact information, including full name, e-mail address, physical

       address (including city, state, and zip code), date of birth, gender, hometown,

       occupation, and other personal identifiers;

b.     All past and current usernames, account passwords, and names associated with

       the account;

c.     The dates and times at which the account and profile were created, and the

       Internet Protocol ("IP") address at the time of sign-up;

d.     All IP logs and other documents showing the IP address, date, and time of each

       login to the account;

e.     All data and information associated with the profile page, including photographs,

       "bios," and profile backgrounds and themes;

f.     All "tweets" and Direct Messages sent, received, "favorited," or retweeted by the

       account, and all photographs or images included in those tweets and Direct

       Messages;

g.      All information from the "Connect" tab for the account, including all lists of Twitter users who have favorited or retweeted tweets posted by the account, as well as a list of all tweets that include the username associated with the account (*i.e.*, "mentions" or "replies");

h.      All photographs and images in the user gallery for the account;

i.      All location data associated with the account, including all information collected by the "tweet with location" service;

j.      All information about the account's use of Twitter's link service, including all longer website links that were shortened by the service, all resulting shortened links, and all information about the number of times that a link posted by the account was clicked;

k.      All data and information that has been deleted by the user;

l.      A list of all of the people that the user follows on Twitter and all people who are following the user (*i.e.*, the user's "following" list and "followers" list);

m.      A list of all users that the account has "unfollowed" or blocked;

n.      All "lists" created by the account;

o.      All information on the "Who to Follow" list for the account;

p.      All privacy and account settings;

q.      All records of Twitter searches performed by the account, including all past searches saved by the account;

r.      All information about connections between the account and third-party websites and applications;

Within 14 days of the issuance of this warrant, PROVIDER shall deliver the information set forth above via United States mail, courier, or e-mail to the following:

FBI Special Agent David Williams, by email at e-mail djwilliams3@fbi.gov, telephone number 212-384-1000, 26 Federal Plaza, New York, NY 10278.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## II.      Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of communication of interstate threats, in violation of 18 U.S.C. § 2101 (interstate travel to riot), 18 U.S.C. § 371 (Klein conspiracy to obstruct a lawful function of government), and conspiracy, in violation of 18 U.S.C. § 371, to commit violations of federal law, including 18 U.S.C. §§ 231(a)(3) (civil disorder) and 2101 (interstate travel to riot), and 40 U.S.C. § 5104 (unlawful activities on the United States Capitol grounds), as well as attempting and abetting these offenses (collectively, the "Subject Offenses"), since November 1, 2020, including, for each username identified on Attachment A, information pertaining to the following matters:

(a) Information that constitutes evidence of the identification or location of the user(s) of the Account;

(b) Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the Account about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

(c) Information that constitutes evidence indicating the Account user's state of mind, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

(d) Information that constitutes evidence concerning how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the Account user;

(e) Communications, photographs and other data relating to the preparation and planning for, organization of, and participation in, the January 6, 2021 rioting on the United States Capitol grounds and inside the United States Capitol, including but not limited to all communications, photographs and other data relating to travel to and from Washington, D.C. in January 2021, the planning for the trip and event, and the purpose for such travel;

(f) Evidence indicating how and when the Twitter account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Twitter account owner;

(g) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

(h) The identity of the person(s) who communicated with the user ID about matters relating to the Subject Offenses, including records that help reveal their whereabouts.

### III.     Government procedures for warrant execution

The United States government will conduct a search of the information produced by the PROVIDER and determine which information is within the scope of the information to be seized specified in Section II.  That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from the PROVIDER that does not fall within the scope of Section II and will not further review the information absent an order of the Court. Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH AN ACCOUNT STORED AT PREMISES CONTROLLED BY TWITTER, INC. PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF VIOLATIONS OF 18 U.S.C. § 371, 18 U.S.C. §§ 231(a)(3), and 2101, and 40 U.S.C. § 5104** | **Case No. 21-sc-703**  <br><br> **Filed Under Seal** |

**Reference:**      *USAO Ref. #*2021R01010*; Subject Accounts:* **@BrndnBckstrm**
                    **User ID: 830164304385101824**

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, David Williams, a Special Agent with the Federal Bureau of Investigation ("FBI"),

being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for

information which is associated with Twitter account @BrndnBckstrm, bearing account number

830164304385101824,  which is stored at premises owned, maintained, controlled, or operated by

Twitter, Inc. ("Twitter" or the "Provider"),  an electronic communications services provider and/or

remote computing services provide, which accepts service at and is headquartered at 1355 Market

Street, Suite 900, San Francisco, California 94103. The information to be searched is described in

the following paragraphs and in Attachment A.  This affidavit is made in support of an application

for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require

PROVIDER to disclose to the government copies of the information (including the content of

communications) further described in Section I of Attachment B.  Upon receipt of the information

described in Section I of Attachment B, government-authorized persons will review that

information to locate the items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.

2.      I am a Special Agent with the FBI currently assigned to the Joint Terrorism Task Force ("JTTF") in New York.  I have participated in numerous investigations, during the course of which I have conducted physical surveillance, interviewed witnesses, executed court-authorized search warrants and used other techniques to secure relevant information.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant.  It does not set forth all of my knowledge, or the knowledge of others, about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of 18 U.S.C. §§ 231(a)(3) (civil disorder) and 2101 (interstate travel to riot), and 40 U.S.C. § 5104 (unlawful activities on the United States Capitol grounds), as well as attempting and abetting these offenses (collectively, the "Subject Offenses") have been committed by BRANDON BECKSTROM, and others.   There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband or fruit of these crimes further described in Attachment B.

## JURISDICTION

5.      This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated."  18 U.S.C. § 2711(3)(A)(i).  As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington,

DC.  *See* 18 U.S.C. § 3237(a).  In addition, PROVIDER is located in the District of Columbia, at corporate offices located at 800 Connecticut Ave NW, Washington, D.C. 20006.  *See* 18 U.S.C. § 2711(3)(A)(ii).

## **PROBABLE CAUSE**

### ***Background – The U.S. Capitol on January 6, 2021***

6.      U.S. Capitol Police (USCP), the FBI, and assisting law enforcement agencies are investigating a riot and related offenses that occurred at the United States Capitol Building, located at 1 First Street, NW, Washington, D.C., 20510 at latitude 38.88997 and longitude -77.00906 on January 6, 2021.

7.      At the U.S. Capitol, the building itself has 540 rooms covering 175,170 square feet of ground, roughly four acres.  The building is 751 feet long (roughly 228 meters) from north to south and 350 feet wide (106 meters) at its widest point.  The U.S. Capitol Visitor Center is 580,000 square feet and is located underground on the east side of the Capitol.  On the west side of the Capitol building is the West Front, which includes the inaugural stage scaffolding, a variety of open concrete spaces, a fountain surrounded by a walkway, two broad staircases, and multiple terraces at each floor.  On the East Front are three staircases, porticos on both the House and Senate side, and two large skylights into the Visitor's Center surrounded by a concrete parkway. All of this area was barricaded and off limits to the public on January 6, 2021.

8.      The U.S. Capitol is secured 24 hours a day by USCP.  Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by USCP.  Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

9.      On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

10.     On January 6, 2021, a joint session of the United States Congress convened at the U.S. Capitol.   During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the U.S. Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which took place on November 3, 2020 ("Certification").  The joint session began at approximately 1:00 p.m. Eastern Standard Time (EST).  Shortly thereafter, by approximately 1:30 p.m. EST, the House and Senate adjourned to separate chambers to resolve a particular objection.   Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

11.     As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol.   As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and USCP were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

12.     At around 1:00 p.m. EST, known and unknown individuals broke through the police lines, toppled the outside barricades protecting the U.S. Capitol, and pushed past USCP and supporting law enforcement officers there to protect the U.S. Capitol.

13.     At around 1:30 p.m. EST, USCP ordered Congressional staff to evacuate the House Cannon Office Building and the Library of Congress James Madison Memorial Building in part because of a suspicious package found nearby.  Pipe bombs were later found near both the Democratic National Committee and Republican National Committee headquarters.

14.     Media reporting showed a group of individuals outside of the Capitol chanting, "Hang Mike Pence."  I know from this investigation that some individuals believed that Vice

President Pence possessed the ability to prevent the certification of the presidential election and that his failure to do so made him a traitor.

15.     At approximately 2:00 p.m. EST, some people in the crowd forced their way through, up, and over the barricades and law enforcement.  The crowd advanced to the exterior façade of the building.  The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by U.S. Capitol Police Officers or other authorized security officials.  At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured.  Members of law enforcement attempted to maintain order and keep the crowd from entering the Capitol.

16.     Shortly after 2:00 p.m. EST, individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts.  Publicly available video footage shows an unknown individual saying to a crowd outside the Capitol building, "We're gonna fucking take this," which your affiant believes was a reference to "taking" the U.S. Capitol.



17.     Shortly thereafter, at approximately 2:20 p.m. EST, members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers.  That is, at or about this time, USCP ordered all nearby staff, Senators, and reporters into the Senate chamber and locked it down.  USCP ordered a similar lockdown in the House chamber.  As the subjects attempted to break into the House chamber, by breaking the windows on the chamber door, law enforcement were forced to draw their weapons to protect the victims sheltering inside.

18.     At approximately 2:30 p.m. EST, known and unknown subjects broke windows and pushed past USCP and supporting law enforcement officers forcing their way into the U.S. Capitol on both the west side and the east side of the building.  Once inside, the subjects broke windows and doors, destroyed property, stole property, and assaulted federal police officers. Many of the federal police officers were injured and several were admitted to the hospital.  The subjects also confronted and terrorized members of Congress, Congressional staff, and the media.

The subjects carried weapons including tire irons, sledgehammers, bear spray, and tasers. They also took police equipment from overrun police including shields and police batons. At least one of the subjects carried a handgun with an extended magazine. These actions by the unknown individuals resulted in the disruption and ultimate delay of the vote Certification.

19.     Also at approximately 2:30 p.m. EST, USCP ordered the evacuation of lawmakers, Vice President Mike Pence, and president pro tempore of the Senate, Charles Grassley, for their safety.

20.     At around 2:45 p.m. EST, subjects broke into the office of House Speaker Nancy Pelosi.

21.     At around 2:47 p.m. EST, subjects broke into the United States Senate Chamber. Publicly available video shows an individual asking, "Where are they?" as they opened up the door to the Senate Chamber. Based upon the context, law enforcement believes that the word "they" is in reference to members of Congress.



22.     After subjects forced entry into the Senate Chamber, publicly available video shows that an individual asked, "Where the fuck is Nancy?"  Based upon other comments and the context, law enforcement believes that the "Nancy" being referenced was the Speaker of the House of Representatives, Nancy Pelosi.



23.     One subject left a note on the podium on the floor of the Senate Chamber.  This note, captured by the filming reporter, stated "A Matter of Time Justice is Coming."



24.     During the time when the subjects were inside the Capitol building, multiple subjects were observed inside the U.S. Capitol wearing what appears to be, based upon my training and experience, tactical vests and carrying flex cuffs.  Based upon my knowledge, training, and experience, I know that flex cuffs are a manner of restraint that are designed to be carried in situations where a large number of individuals are expected to be taken into custody.





25.     At around 2:48 p.m. EST, DC Mayor Muriel Bowser announced a citywide curfew

beginning at 6:00 p.m. EST.

26.     At around 2:45 p.m. EST, one subject was shot and killed while attempting to break into the House chamber through the broken windows.

27.     At about 3:25 p.m. EST, law enforcement officers cleared the Senate floor.

28.     Between 3:25 and around 6:30 p.m. EST, law enforcement was able to clear the U.S. Capitol of all of the subjects.

29.     Based on these events, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. EST the same day.  In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured.  The proceedings resumed at approximately 8:00 pm after the building had been secured.  Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

30.     Beginning around 8:00 p.m. EST, the Senate resumed work on the Certification.

31.     Beginning around 9:00 p.m. EST, the House resumed work on the Certification.

32.     Both chambers of Congress met and worked on the Certification within the Capitol building until approximately 3:00 a.m. EST on January 7, 2021.

33.     During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

34.     Based on my training and experience, I know that it is common for individuals to carry and use their cell phones during large gatherings, such as the gathering that occurred in the area of the U.S. Capitol on January 6, 2021.  Such phones are typically carried at such gatherings to allow individuals to capture photographs and video footage of the gatherings, to communicate with other individuals about the gatherings, to coordinate with other participants at the gatherings, and to post on social media and digital forums about the gatherings.

35.     Many subjects seen on news footage in the area of the U.S. Capitol are using a cell phone in some capacity.  It appears some subjects were recording the events occurring in and around the U.S. Capitol and others appear to be taking photos, to include photos and video of themselves after breaking into the U.S. Capitol itself, including photos of themselves damaging and stealing property.  As reported in the news media, others inside and immediately outside the U.S. Capitol live-streamed their activities, including those described above as well as statements about these activities.

36.     Photos below, available on various publicly available news, social media, and other media show some of the subjects within the U.S. Capitol during the riot.  In several of these photos, the individuals who broke into the U.S. Capitol can be seen holding and using cell phones, including to take pictures and/or videos:





[1] https://losangeles.cbslocal.com/2021/01/06/congresswoman-capitol-building-takeover-an-attempted-coup/
[2] https://www.businessinsider.com/republicans-objecting-to-electoral-votes-in-congress-live-updates-2021-1.



### *Facts Specific to This Application*

37.     BECKSTROM is a 41-year old American citizen.  Based on law enforcement records, BECKSTROM resides in Queens, New York.    As discussed in detail below, BECKSTROM appears to have traveled to Washington, D.C., from New York City on or about January 6, 2021, and participated in the rioting in the Capitol.  As also discussed below, there is probable cause to conclude that the SUBJECT ACCOUNT contains evidence of his involvement in this criminal activity and the Subject Offenses.

38.     Subscriber information for the SUBJECT ACCOUNT traces back to a cell phone number and an email address that, according to credit report records and other law enforcement and commercial database records are associated with BECKSTROM.  Additionally, as discussed

---

[3]https://www.thv11.com/article/news/arkansas-man-storms-capitol-pelosi/91-41abde60-a390-4a9e-b5f3-d80b0b96141e

further below, images of BECKSTROM, which match the likeness of BECKSTROM's passport photograph, were published on the SUBJECT ACCOUNT, further corroborating that he operates the account.

39.     On or about December 23, 2020, in response to a tweet asking, "Who will be in Washington DC on January 6th?" BECKSTROM used the SUBJECT ACCOUNT to reply, "I'll be there."  An image of the tweet is below:



40.     On or about December 23, 2020, in response to a tweet saying, "See you on January 6th in DC.  Every patriot within 200 miles needs to show up," BECKSTROM used the SUBJECT ACCOUNT to reply, "will be there."  An image of the tweet is below:



41.     On or about January 6, 2021, BECKSTROM used the SUBJECT ACCOUNT to post a tweet with an accompanying image[4] that I recognize to be taken immediately outside the Capitol.  Although BECKSTROM is not visible in the image, based on the nature of the image and the other evidence described herein, I believe this image was taken by BECKSTROM.  In the tweet, BECKSTROM states, "I was there, went up the steps myself, there was no antifa.  Good people fed up with the nonsense election."  An image of the tweet is below:



42.     The image shows rioters climbing on the steps of and outside the Capitol.  This

---

[4] The image appears to be a still image from a 19-second video-clip.  Law enforcement has not yet located the original video, as it has been removed from the publicly-accessible portion of the SUBJECT ACCOUNT.

image is consistent with similar publicly available images and videos where crowds of people breached the barriers set up by law enforcement and unlawfully entered and rioted outside and on the steps of the Capitol.

43.     On or about January 7, 2021, BECKSTROM used the SUBJECT ACCOUNT to tweet, "I was there, and all of those were used.  People literally used the shields to break windows. I was pepper sprayed myself.  Police had helmets, armor and real bullets."  In response, a user with the Twitter handle @Sassycpr asked, "You assaulted the capital building and the police?  BECKSTROM, using the SUBJECT ACCOUNT, responded "Nope, but I was there.  Some men have bigger balls than you apparently".  An image of the thread is below:[5]



---

[5] An image of BECKSTOM's initial tweet shows the tweet was posted on January 7, 2021 at 12:37 a.m.  The image included above, which shows a time stamp of January 6, 2021 at 10:09 p.m., was taken from another user's feed.  The difference in the date of the time stamp is likely attributable to BECKSTROM and the other user, whose IP address was located in California, being in different time zones.

44.     On a date unknown, BECKSTROM used the SUBJECT ACCOUNT to respond to a tweet by @real_thomas777.[6]   BECKSTROM tweeted the following: "Hope you didn't miss this" and attaches a photograph of a man outside of the Capitol.  I recognize the man in the photograph to be BECKSTROM based on my review of BECKSTROM's passport photograph. An image of the tweet is below:



45.     CCTV footage from outside of the Capitol on January 6, 2021 also places an individual matching the likeness of BECKSTROM, as shown in the above image, outside of the Capitol on January 6, 2021.   Additionally, pursuant to an authorized search warrant, law

---

[6] A screen shot of the tweet was received by law enforcement via a tip line on January 7, 2021.  Based on the content of the tweet and the date the screen shot was received, I believe this tweet was posted on January 6 or January 7, 2021.

enforcement obtained records from AT&T for cell towers providing service to the United States Capitol. A phone number that, according to credit report records and other law enforcement and commercial database records is associated with BECKSTROM was identified as having utilized a cell site consistent with providing service to the geographic area that includes the interior of the United States Capitol building in and around the time of the incident.

46.     Based on the foregoing, there is probable cause to believe that the SUBJECT ACCOUNT contains evidence of the Subject Offenses, including evidence of BECKSTROM's travel from Queens, New York, to Washington, D.C., to take part in the violent rioting and siege of the Capitol, as well as of BECKSTROM's state of mind and intent in engaging in such activity. There is also probable cause to believe that the SUBJECT ACCOUNT will contain evidence of the identities of other individuals with whom BECKSTROM may have conspired to commit such offenses.

47.     On February 4, 2021, PROVIDER was served with a preservation letter under 18 U.S.C. § 2703(f) related to Account @BrndnBckstrm, User ID: 830164304385101824.

## BACKGROUND CONCERNING PROVIDER'S ACCOUNTS

48.     Twitter owns and operates a free-access social-networking website of the same name that can be accessed at http://www.twitter.com.  Twitter allows its users to create their own profile pages, which can include a short biography, a photo of themselves, and location information.  Twitter also permits users create and read 140-character messages called "tweets," and to restrict their "tweets" to individuals whom they approve.  These features are described in more detail below.

49.     Upon creating a Twitter account, a Twitter user must create a unique Twitter username and an account password, and the user may also select a different name of 20 characters

or fewer to identify his or her Twitter account.  The Twitter user may also change this username, password, and name without having to open a new Twitter account.

50.     Twitter asks users to provide basic identity and contact information, either during the registration process or thereafter.  This information may include the user's full name, e-mail addresses, physical address (including city, state, and zip code), date of birth, gender, hometown, occupation, and other personal identifiers.  For each user, Twitter may retain information about the date and time at which the user's profile was created, the date and time at which the account was created, and the Internet Protocol ("IP") address at the time of sign-up.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access a given Twitter account.

51.     A Twitter user can post a personal photograph or image (also known as an "avatar") to his or her profile, and can also change the profile background or theme for his or her account page.  In addition, Twitter users can post "bios" of 160 characters or fewer to their profile pages.

52.     Twitter also keeps IP logs for each user.  These logs contain information about the user's logins to Twitter including, for each access, the IP address assigned to the user and the date stamp at the time the user accessed his or her profile.

53.     As discussed above, Twitter users can use their Twitter accounts to post "tweets" of 140 characters or fewer.  Each tweet includes a timestamp that displays when the tweet was posted to Twitter.  Twitter users can also "favorite," "retweet," or reply to the tweets of other users.  In addition, when a tweet includes a Twitter username, often preceded by the @ sign, Twitter designates that tweet a "mention" of the identified user.  In the "Connect" tab for each account, Twitter provides the user with a list of other users who have "favorited" or "retweeted" the user's

own tweets, as well as a list of all tweets that include the user's username (i.e., a list of all "mentions" and "replies" for that username).

54.     Twitter users can include photographs or images in their tweets.  Each Twitter account also is provided a user gallery that includes images that the user has shared on Twitter, including images uploaded by other services.

55.     Twitter users can also opt to include location data in their tweets, which will reveal the users' locations at the time they post each tweet.  This "tweet with location" function is off by default, so Twitter users must opt in to the service.  In addition, Twitter users may delete their past location data.

56.     When Twitter users want to post a tweet that includes a link to a website, they can use Twitter's link service, which converts the longer website link into a shortened link that begins with http://t.co.  This link service measures how many times a link has been clicked.

57.     A Twitter user can "follow" other Twitter users, which means subscribing to those users' tweets and site updates.  Each user profile page includes a list of the people who are following that user (i.e., the user's "followers" list) and a list of people whom that user follows (i.e., the user's "following" list).  Twitter users can "unfollow" users whom they previously followed, and they can also adjust the privacy settings for their profile so that their tweets are visible only to the people whom they approve, rather than to the public (which is the default setting).  A Twitter user can also group other Twitter users into "lists" that display on the right side of the user's home page on Twitter.  Twitter also provides users with a list of "Who to Follow," which includes a few recommendations of Twitter accounts that the user may find interesting, based on the types of accounts that the user is already following and who those people follow.

58.     In addition to posting tweets, a Twitter user can also send Direct Messages (DMs) to one of his or her followers.  These messages are typically visible only to the sender and the recipient, and both the sender and the recipient have the power to delete the message from the inboxes of both users.  As of January 2021, Twitter displayed only the last 100 DMs for a particular user, but older DMs are stored on Twitter's database.

59.     Twitter users can configure the settings for their Twitter accounts in numerous ways.  For example, a Twitter user can configure his or her Twitter account to send updates to the user's mobile phone, and the user can also set up a "sleep time" during which Twitter updates will not be sent to the user's phone.

60.     Twitter includes a search function that enables its users to search all public tweets for keywords, usernames, or subject, among other things.  A Twitter user may save up to 25 past searches.

61.     Twitter users can connect their Twitter accounts to third-party websites and applications, which may grant these websites and applications access to the users' public Twitter profiles.

62.     If a Twitter user does not want to interact with another user on Twitter, the first user can "block" the second user from following his or her account.

63.     In some cases, Twitter users may communicate directly with Twitter about issues relating to their account, such as technical problems or complaints.  Social-networking providers like Twitter typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.  Twitter may also suspend a particular user

for breaching Twitter's terms of service, during which time the Twitter user will be prevented from using Twitter's services.

64. As explained herein, information stored in connection with a Twitter account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Twitter user's account information, IP log, stored electronic communications, and other data retained by Twitter, can indicate who has used or controlled the Twitter account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, communications, "tweets" (status updates) and "tweeted" photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Twitter account at a relevant time. Further, Twitter account activity can show how and when the account was accessed or used. For example, as described herein, Twitter logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Twitter access, use, and events relating to the crime under investigation. Additionally, Twitter builds geo-location into some of its services. If enabled by the user, physical location is automatically added to "tweeted" communications. This geographic and timeline information may tend to either inculpate or exculpate the Twitter account owner. Last, Twitter account activity may provide relevant insight into the Twitter account owner's state of mind as it relates to the offense under investigation. For

example, information on the Twitter account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a criminal plan) or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

65.     Therefore, the computers of Twitter are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Twitter, such as account access information, transaction information, and other account information.

66.     PROVIDER is the provider of the internet-based SUBJECT ACCOUNT.

67.     In summary, based on my training and experience in this context, I believe that the computers of PROVIDER are likely to contain user-generated content such as stored electronic communications (including retrieved and unretrieved messages for PROVIDER subscribers), as well as PROVIDER-generated information about its subscribers and their use of PROVIDER services and other online services.  In my training and experience, all of  that information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.  In fact, even if subscribers provide PROVIDER with false information about their identities, that false information often nevertheless provides clues to their identities, locations, or illicit activities.

68.     Based on my training and experience, I know that evidence of who controlled, used, and/or created a PROVIDER account may be found within the user-generated content created or stored by the PROVIDER subscriber.  This type of evidence includes, for example, personal correspondence, personal photographs, purchase receipts, contact information, travel itineraries, and other content that can be uniquely connected to a specific, identifiable person or group.  In addition, based on my training and experience, I know that this type of user-generated content can

provide crucial identification evidence, whether or not it was generated close in time to the offenses under investigation. This is true for at least two reasons. First, people that commit crimes involving electronic accounts (*e.g.*, e-mail accounts) typically try to hide their identities, and many people are more disciplined in that regard right before (and right after) committing a particular crime. Second, earlier-generated content may be quite valuable, because criminals typically improve their tradecraft over time. That is to say, criminals typically learn how to better separate their personal activity from their criminal activity, and they typically become more disciplined about maintaining that separation, as they become more experienced. Finally, because e-mail accounts and similar PROVIDER accounts do not typically change hands on a frequent basis, identification evidence from one period can still be relevant to establishing the identity of the account user during a different, and even far removed, period of time.

### REQUEST TO SUBMIT WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

69.     I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant. I submit that Assistant U.S. Attorney Anthony L. Franks, an attorney for the United States, is capable of identifying my voice and telephone number for the Court.

## **CONCLUSION**

70.     Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on PROVIDER, who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.  Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,

_____
DAVID WILLIAMS
Special Agent
Federal Bureau of Investigation


Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on March 2nd, 2021.


_____
ZIA M. FARUQUI
UNITED STATES MAGISTRATE JUDGE

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by _____ ("PROVIDER"), and my title is _____. I am a custodian of records for PROVIDER, and I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of PROVIDER.  The attached records consist of:

_____

[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]

I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of PROVIDER, and they were made by PROVIDER as a regular practice; and

b.      such records were generated by PROVIDER's electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of PROVIDER in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by PROVIDER, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.


_____     _____
Date                                                        Signature